**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SEEDAN REAL ESTATE HOLDING, LLC,**

                            **Plaintiff,**

**v.**                                                          **3:16-cv-00595 (NAM/DEP)**

**DANIEL LEARY, ROBERT CHISARI, and**
**THE VILLAGE OF WAVERLY,**

                            **Defendants.**
_____

**APPEARANCES:**

Luciano L. Lama, Esq.
Lama Law Firm
2343 N. Triphammer Road
Ithaca, New York 14850
_Attorney for Plaintiff_

Stephen M. Groudine, Esq.
Murphy, Burns Law Firm
226 Great Oaks Boulevard
Albany, New York 12203
_Attorney for Defendants_

**Hon. Norman A. Mordue, Senior United States District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I.   INTRODUCTION

       This action arises from the demolition of a historic office building located at 439 Fulton

Street in the Village of Waverly, New York.  Plaintiff Seedan Real Estate Holding, LLC, the

owner of the building, brings claims under 42 U.S.C. § 1983 against Defendants Mayor Daniel

Leary, Code Enforcement Officer Robert Chisari, and the Village of Waverly (collectively the

"Village Defendants"), alleging that the demolition violated its constitutional rights.  (Dkt. No.

17).  Now before the Court is Defendants' motion for summary judgment, (Dkt. No. 50), and

Plaintiff's papers in opposition.  (Dkt. No. 53).  For the following reasons, Defendants' motion

is granted.

## II.  BACKGROUND

### A.  PROCEDURAL HISTORY

Plaintiff filed its initial complaint on May 20, 2016.  (Dkt. No. 1).  The Court then

granted in part and denied in part Defendants' motion to dismiss for failure to state a claim.

(Dkt. No. 15).  In that decision, the Court dismissed Plaintiff's state law negligence claim, along

with Plaintiff's claim under the Takings Clause of the Fifth Amendment.  (*Id.*, pp. 5–6).

However, the Court denied Defendants' motion to dismiss Plaintiff's § 1983 causes of action for

alleged violations of Plaintiff's constitutional rights under the Fourth and Fourteenth

Amendments.  (*Id.*, pp. 6–9).  The Court also granted Plaintiff's cross-motion to amend its

complaint.  (*Id.*, p. 5).  The Amended Complaint again alleges that the demolition of the

building constituted an unreasonable seizure in violation of the Fourth Amendment, and further

that Plaintiff was denied due process under the Fourteenth Amendment.  (Dkt. No. 17).

### B.  FACTS

The following undisputed facts are derived from Defendants' Statement of Material

Facts, affidavits, and supporting exhibits, (*see* Dkt. No. 50), as well as the supporting exhibits

that Plaintiff provided in its opposition papers, to the extent they are in admissible form.  (*See*

Dkt. No. 53).  Plaintiff failed to directly respond to Defendants' Statement of Material Facts as

required under Local Rule 7.1(a)(3).[1]  Accordingly, the Court accepts Defendants' facts as true

to the extent they are supported by admissible evidence in the record.  *See* N.D.N.Y. L.R.

---

[1] The Court has considered the facts asserted in Plaintiff's attorney affirmation and memorandum of law, (Dkt. No. 53-1; Dkt. No. 53-2, pp. 1–3), but only to the extent they are supported by admissible evidence in the record.

7.1(a)(3); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion."). The Court construes the facts in the light most favorable to the Plaintiff.

## 1. The Property

The National Protective Legion Building ("NPL Building"), located at 439 Fulton Street in Waverly, New York, was originally constructed in the late 1800s for use as office space. (Dkt. No. 50-14, p. 2). The building lay vacant from 1999 until its eventual demolition in 2015. (*Id.*). In September 2005, Plaintiff, through its sole proprietor Mousa A. Kahlil, purchased the NPL Building and underlying property for $6,000. (Dkt. No. 50-3, pp. 38:8–39:2). At all relevant times, Mr. Kahlil was in charge of managing and maintaining the property. (Dkt. No. 53, ¶ 4).

## 2. Village Code Regarding "Unsafe Buildings"

Under the Village Code, "[n]o person, firm, corporation or association owning, possessing *or* controlling a building in the Village of Waverly shall permit, suffer or allow said building now or hereafter to be or become unsafe to the public and/or residents from any cause whatsoever." (Village of Waverly Village Code § 54-3; *see* Dkt. No. 50-16, p. 3). The Village Code defines an "unsafe building" as one that has any or all the following defects:

> A. Interior or exterior bearing walls or other vertical structural members that list, lean or buckle to such an extent as to weaken the structural support they provide.
>
> B. Thirty-three percent or more damage to or deterioration of the supporting member or members or 50% damage to or deterioration of the nonsupporting, enclosing or outside walls or covering.

C.  Improperly distributed loads upon the floors or roofs or in which the same are overloaded or which have insufficient strength to be reasonably safe for the purpose used.

D.  Those which have been damaged by any cause so as to have become dangerous to life, safety or the general health and welfare of the occupants or the people of the Village of Waverly.

E.  Those which are so dilapidated, decayed, unsafe and/or unsanitary that they are unfit for human habitation in accordance with normally accepted standards set for human habitability.

F.  Light, air and sanitation facilities inadequate to protect the health, safety or general welfare of human beings who may live therein, with particular reference to the requirements of the New York State Uniform Fire Prevention and Building Code as a determinant.

G.  Those having inadequate facilities for exit in case of fire or other emergency or those having insufficient stairways, elevators or fire escapes, again referencing the New York State Uniform Fire Prevention and Building Code as a determinant.

H.  Parts thereof which are so inadequately attached that they may fall and injure members of the public or property.

I.  Those which consist in the main of debris, rubble or parts of buildings left on the ground after demolition, reconstruction, fire or other casualty.

J.  Those which, because of their condition, are unsafe, unsanitary or dangerous to the health, safety or general welfare of the people of the Village of Waverly.

(Village Code § 54-2; *see* Dkt. No. 50-16, pp. 2–3).

The Village Code requires the Village Code Enforcement Officer to make regular reports to the Village Board of any unsafe buildings within village limits. (Village Code § 54-4; *see* Dkt. No. 50-16, p. 3). "The Village Board shall consider the reports of the Code Enforcement Officer and, if in the opinion of the Village Board the report so warrants, shall determine that the building is unsafe and order its repair or demolition, if the same cannot be safely repaired, and

4

further order that a notice shall be given to the owner . . . ." (Village Code § 54-5; *see* Dkt. No. 50-16, p. 3).

Following a building's designation as an "unsafe building," a "hearing shall be conducted before the Village Board [at which] the Code Enforcement Officer shall present his or her report to the Village Board in writing.  The owner or his or her representative, if present, shall call such witnesses as he or she deems necessary.  The Village Board shall make written findings of fact from the testimony offered as to whether or not the building in question is an unsafe building . . . .  If such owner shall neglect, fail or refuse to comply and shall fail to appear at said hearing, then the Village Board shall direct the repair or demolition of the building forthwith." (Village Code § 54-7(A)–(B); *see* Dkt. No. 50-16, p. 4).

In the case of an emergency, where, "in the opinion of the Village Board, [there exists] actual and immediate danger of the falling of a building so as to endanger public safety, life or property so as to be an actual or immediate menace to health or public welfare as a result of the conditions present in or about a building, the Village Board shall cause the necessary work to be done or render such a building temporarily safe . . . ." (Village Code § 54-9(A); *see* Dkt. No. 50-16, pp. 4–5).  "In the event that the emergency does not permit any delay in correction, the notice [to the property owner] shall state that the Village has corrected the emergency situation," and that "the corrective costs of the emergency will be assessed against the owner pursuant to the [Village Code]." (Village Code § 54-9(C)–(D); *see* Dkt. No. 50-16, p. 5).

### 3.  History of Building Maintenance and Code Violations

After taking ownership of the property in 2005, Plaintiff spent $126,478.00 on maintenance and repairs of the NPL Building, including costs associated with rebuilding the roof, extensive trash removal, and repairs to the building's façade.  (Dkt. No. 53, ¶¶ 5–6).  Mr.

Khalil acknowledged at his deposition that he purchased the property knowing that it was "a big huge building and it need[ed] a lot of work and that's why it [was] cheap because nobody want[ed] to buy it to take responsibility." (Dkt. No. 50-3, p. 40:9–11).

On numerous occasions throughout Plaintiff's ownership of the NPL Building, Plaintiff was cited and summoned to Village Court for violations of the New York State Property Maintenance Code. (Dkt. No. 50-7, ¶ 15; *see generally* Dkt. No. 50-18, pp. 2–61). In February 2006, the Village cited Plaintiff for infractions related to maintenance of the building's foundation, exterior walls, roof and drainage system, windows, and door frames. (Dkt. No. 50-18, p. 2). In June 2006, the Village cited Plaintiff again for similar violations. (*Id*., p. 4). In 2007, the Village demanded that Plaintiff address unsecured windows and remediate discarded refuse surrounding the building. (*Id*., pp. 9–10). The Village later informed Plaintiff that juveniles had obtained access to the building through unsecured windows on the ground level, causing concern that someone could be injured or cause damage to the building. (*Id*.).

In November 2007, the Village Attorney informed Plaintiff that the Code Enforcement Officer was "very concerned about the condition of the building" and demanded that Plaintiff address the needed repairs before the end of the year. (Dkt. No. 50-18, p. 16). In 2008, Plaintiff paid $40,000 to a contractor to rebuild the building's roof. (Dkt. No. 53, ¶ 5).

In November 2013, Plaintiff provided the Village with keys and authorization to access all areas of the building for inspections when the Village deemed necessary. (Dkt. No. 17-4, p. 2). On December 2, 2013, Code Enforcement Officer Chisari wrote to Plaintiff detailing the findings of a building inspection conducted in November 2013 which found a variety of hazardous code violations. (Dkt. No. 50-18, pp. 25–26). Mr. Chisari wrote:

> The roof is obviously leaking. The 3rd level has a pool of standing water on the floor in front of the fireplace . . . . There is evidence

> of water damage on all levels due to the leakage from the roof above. The concrete ceiling is sagging about 8" and rusted rebar is exposed due to deterioration of the ceiling. There is evidence that the interior of the building is shifting. This is demonstrated by the fact that interior walls and partitions show buckling to the point that glass panes have been blown out of their frames, and door frames have been forcibly split and the doors were ejected and broken into pieces. Concrete floors and ceilings on every level are uneven and some floor areas show buckling as well.

(*Id.*, p. 25).

On March 21, 2014, Mr. Chisari sent another letter reiterating the findings from the November 2013 inspection and further stating:

> In a telephone conversation on 12/19/13, you informed Code Enforcement that a local contractor would be calling us in regard to repairing the broken windows; and boarding them up per the NYS code requirements for vacant buildings. We were also informed that you were to bring a "team" to review the condition of the NPL building at the end of January 2014 with the intention of making repairs to the structure. As of this date, none of this has occurred. No further communication has been received in regard to your intentions in this matter, therefore, Violation Notices have been issued with a compliance date of 03/31/14.

(*Id.*, p. 35).

### 4. Designation as an "Unsafe Building"

On October 14, 2014, the Village Board formally designated the NPL Building as an "unsafe building" under Waverly Village Code § 54-5. (Dkt. Nos. 50-7, ¶ 19; 50-5, p. 63). On November 6, 2014, the Village Attorney notified Plaintiff by letter of the Village Board's determination and warned that if Plaintiff did not complete the necessary repairs within 30 days, including "repair[ing] the roof which is leaking an[d] causing structural damage," the Village reserved the right to "[i]nstitute a special proceeding to collect the costs of demotion [sic], including legal expenses." (Dkt. No. 50-18, pp. 40–41). Thereafter, pursuant to Village Code §§ 54-5–54-7, the Village Board scheduled a hearing for December 8, 2014. (*Id.*). At Mr.

Khalil's request, the Village Board adjourned the hearing until December 22, 2014. (*See id.*, pp. 43, 46).

On December 10, 2014, the Village sent Plaintiff a letter stating that he should schedule a time to go through the property with Code Enforcement Officer Chisari as the building was in "serious disrepair." (Dkt. No. 50-18, p. 46). The letter further informed Plaintiff that following the Village Board's review of a report by Chisari, the Board ordered that Plaintiff "begin to secure all windows, doors and opening in the property, remove pigeons living in the property, repair or remove the fire escape which is rusted and deteriorated, secure stairwell leading to the basement entrances and repair the roof which is leaking an[d] causing structural damage, within ten (10) days of [his] receipt of this notice and that said actions shall be completed with[in] thirty (30) days thereafter." (*Id.*). The letter stated that if Plaintiff did not do so, the Village Board was "authorized to: 1. Provide for the securing and/or repair of the building as set forth above; 2. Assess all expenses thereof against [the land, insurance proceeds, owners, or any combination thereof] . . . ." (*Id.*, p. 47).

Neither Mr. Khalil, nor any other representative of the Plaintiff, appeared at the rescheduled Village Board hearing on December 22, 2014. (Dkt. No. 50-4, p. 38:3–17). On January 20, 2015, the Village Attorney wrote to Plaintiff again, stating that:

> The Village Board requested that I contact you again regarding its findings from the hearing held on December 22, 2014, regarding the [NLP Building]. Enclosed is a copy of my letter to you on December 29, 2014 advising you of the Board's findings. At the Village Board meeting on January 13, 2015, the Board was presented with a letter from Code Enforcement Officer Robert Chisari which sets forth the items which you need to repair immediately. If the repairs are not completed prior to the Board's next meeting on February 10, 2015, the Board will pursue proposals from contactors for the listed work. The cost of the contractor's work will be your responsibility.

(Dkt. No. 50-18, p. 60). Mr. Chisari's January 13, 2015 letter to Plaintiff included a list of items that needed to be performed to secure and repair the NPL Building, including demands that Plaintiff: 1) remove all pigeons; 2) provide additional coverage for windows currently boarded with inadequate plywood, paneling and hardboard with weather resistant plywood and fasteners of adequate strength and weather resistance; 3) remediate the deteriorated wall and stairs in the basement entry; and 4) secure other at-risk windows. (Dkt. No. 50-18, p. 50).

After January 20, 2015, there was no further communication between the parties until after the partial roof collapse on April 6, 2015. The record contains no evidence that Plaintiff made any effort to address the aforementioned maintenance problems. Mr. Khalil claims that he was "unable to have the building immediately repaired." (Dkt. No. 53, ¶ 17).

### 5. Roof Collapse, Inspection, and Demolition

On April 6, 2015, Code Enforcement Officer Chisari and several contractors went up on the roof of the NPL Building to assess remedial measures for the building's various code violations. (Dkt. No. 50-17, ¶ 10). During that inspection, Mr. Chisari "noticed that there was a large area of water pooled on the roof with dimensions of about 25 feet in length, 15 feet wide and 6 inches deep." (*Id.*, ¶ 11). Moments later, while Chisari and the contractors were still on the roof, they heard a loud cracking sound followed by the collapse of a large section of the roof into the third floor of the NPL Building. (*Id.*, ¶¶ 11–12).

Shortly after the roof collapse around mid-day on April 6, 2015, Chisari and the Village Attorney informed Mayor Leary of the collapse. (Dkt. No. 50-15, ¶¶ 6–7). Mayor Leary then observed the partially collapsed roof from the street, where he "could clearly see that the front portion of the roof had caved in." (*Id.*, ¶ 8). Thereafter, Mayor Leary called Mr. Khalil to notify him of the partial collapse. (*Id.*, ¶ 9). Mayor Leary and Mr. Khalil did not discuss demolition at

that time.  (Dkt. Nos. 50-15, ¶ 11; 50-4, pp. 44:21–45:6; 53-3, p. 59 at 14:1–3).[2]  According to

Mr. Khalil's deposition testimony, Mayor Leary informed him that the Village might "have to

hire people to take care of it.  But [Mayor Leary] didn't say [] he's going to demolish the

building or something like that."  (Dkt. No. 50-4, pp. 44:24–45:2).  Mr. Khalil also states that he

hired David Elwyn of Elwyn & Palmer Consulting Engineers PLLC, "to inspect the building so

that [he] could begin repairs."  (Dkt. No. 53, ¶ 22).

On the afternoon of April 6, 2015, following Mayor Leary's conversation with Mr.

Khalil, Professional Engineer Kristi Rathbun from Hunt Engineers, Architects, Land Surveyors

and Landscape Architect DPS arrived to inspect the partially collapsed NPL Building.  (Dkt.

Nos. 50-15, ¶ 12; 50-8, ¶ 4).  Ms. Rathbun's inspection concluded that extensive water

infiltration was present throughout the building.  (Dkt. No. 50-8, ¶ 9).  Ms. Rathbun further

observed that:

> [A] section of the roof that was approximately twenty-one
> feet long and sixteen feet wide had collapsed onto the third
> floor of the building.  The section that collapsed extended
> from the front wall of the building to the first line of concrete
> beams. There were sections of roof slab on either side of this
> opening that were still connected, they showed obvious
> signs of damage.  The slab to the south of the opening had a
> significant amount of ponding water on the roof which was
> a sign that it was sagging.  The slab to the north of the
> opening appeared to have been damaged when the adjacent
> section fell and it was also sagging.  The front wall next to
> the collapsed roof slab was slightly rotated towards the
> inside of the building . . . .  Although the building appeared
> to have some roofing work done since the previous

---

[2] The Court notes that Mr. Khalil's affidavit states that Mayor Leary informed him of "the possibility of demolition" during their April 6, 2015 phone call. (Dkt. No. 53, ¶ 20). However, that claim stands in stark contrast to Mr. Khalil's own sworn deposition, where he testified that they did not discuss the Village's position on demolition. (Dkt. No. 50-4, pp. 44:21–46:7). As noted by the Defendants, it is well-settled in the Second Circuit that a party's affidavit which contradicts his own prior deposition testimony is insufficient to create an issue of fact and should be disregarded on a motion for summary judgment. *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) (citing *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)). Accordingly, the Court will disregard Mr. Khalil's assertions in his affidavit regarding the substance of that phone call.

inspection in 2004, there was evidence of recent water infiltration within the building.

(*Id.*, ¶¶ 11–12).

Following the inspection on the evening of April 6, 2015, Ms. Rathbun verbally informed Mayor Leary, Code Enforcement Officer Chiari and other village officials that:

> [I]n its condition on the afternoon of April 6, 2015, 439 Fulton Street was an emergency situation because it was unstable and a threat to public safety as falling pieces of the building, or the entire building itself could have collapsed at any time and caused injury to people walking or driving below or damaged adjoining properties . . . . [T]he building at 439 Fulton Street needed to be immediately condemned and demolished for the public's safety.

(*Id.*, ¶ 15(g)–(h)).

At 6:30PM on April 6, 2015, after receiving Ms. Rathbun's verbal opinion and conclusions as to the structural integrity of the NPL Building, the Village Board met in an emergency session and voted to demolish the building under the emergency demolition provisions provided in Village Code § 54-9. (Dkt. Nos. 50-15, ¶ 15; 50-17, ¶ 18). Following that vote, the Village Board retained a construction company to begin demolition of the NPL Building. (Dkt. No. 50-15, ¶ 18).

Demolition of the NPL Building began on the morning of April 7, 2015. (*Id.*, ¶ 19). That same day, the Village Attorney sent a letter to Plaintiff stating the following:

> As you know from your conversation with Mayor Leary yesterday, a large section of the roof on your building located at 439 Fulton Street, collapsed. Last night at the Village Board meeting the Board voted to engage the services of Hunt Engineering immediately and there was an engineer-on site yesterday. The opinion of the engineer is that the building needs to be demolition immediately. The Village has engaged the services of Rorick Contracting to demolition the building. The demolition work started this afternoon. The cost of this work will added [sic] to your village tax bill.

(Dkt. No. 50-18, p. 61).

On April 8, 2015, Ms. Rathbun reiterated her verbal conclusions from April 6, 2015 in a written report, stating:

> It is evident that the continual water infiltration through the building is the cause of the degradation of the structural slab. Also, the weight of the standing water on the roof contributed to the partial roof collapse. The impact of the concrete roof slab on the third floor may have compromised the structural integrity of that floor slab.
>
> This opening in the roof has left approximately twenty feet of the front wall with no bracing at the top. Without proper bracing the stability of this wall is in question and removing this section of wall down to the third floor will compromise structural integrity of the walls and roof on either side of the collapse.
>
> There is also historical documentation that the remainder of the building structure is also deteriorated with corroded reinforcing, spalled concrete, and past water infiltration throughout the building. Compromised concrete systems as described above tend to fail with little or no warning. [ ]
>
> In its current condition, 439 Fulton Street is unstable and a threat to public safety. For this reason, HUNT recommends that the building be condemned until demolition can occur for public safety reasons.

(Dkt. No. 50-14, p. 3).

When the demolition was completed, the Village of Waverly sent Plaintiff a $440,103.75 bill for reimbursement of the demolition costs. (Dkt. Nos. 50-7, ¶ 51; 53-2, p. 3). The demolition occurred before Mr. Elwyn, the engineer hired by Mr. Khalil, could inspect the building or begin repairs. (Dkt. No. 53, ¶ 23). Mr. Khalil claims that the demolition "was not necessary, especially when I was prepared to make all necessary repairs." (*Id.*, ¶ 24). Mr. Khalil states that the building was "extremely strong," and "[e]ven with the partial roof collapse, it was very stable and this issue could have been remedied with immediate repair instead of immediate demolition." (*Id.*, ¶ 26–27). Mr. Khalil also claims that "[t]he building was not in immediate danger of collapse and the report from Hunt Engineering was written after the

demolition had already taken place." (*Id.*, ¶ 29). In sum, Mr. Khalil claims that the Village "did not give me proper notice of this demolition or due process to contest the demolition and remedy the damage from the partial roof collapse." (*Id.*, ¶ 31).

### III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Further, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and the grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the

nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

## IV. DISCUSSION

In moving for summary judgment, Defendants argue that: 1) Plaintiff fails to establish a § 1983 claim against any of the Defendants; 2) that Defendants are entitled to qualified immunity; and 3) the Plaintiff's responses to certain contention interrogatories should be deemed as admissions. (Dkt. No. 50-20). Though not a model of clarity, Plaintiff's Amended Complaint appears to assert three causes of action against Mayor Leary and Code Enforcement Officer Chisari for their roles in authorizing the demolition of the NPL Building: 1) a procedural due process claim; 2) a substantive due process claim; and 3) a Fourth Amendment claim. (Dkt. No. 17). Plaintiff also alleges a claim pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) against the Village of Waverly based on the Village Board's invocation of Village Code § 54-9(C) to demolish the building.[3] (*See generally* Dkt. Nos. 17; 53-2). The Court will consider each claim in turn.

### A. PERSONAL INVOLVEMENT

As an initial matter, Defendants argue that Code Enforcement Officer Chisari and Mayor Leary were not personally involved in the decision to demolish the NPL Building. (Dkt. No. 50-20, pp. 17–19). "[P]ersonal involvement of the individual defendants in alleged constitutional deprivation is a prerequisite to an award of damages under § 1983." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001)). Thus, to withstand a motion for summary judgment, Plaintiff must raise a genuine

---

[3] Although the Amended Complaint appears to lump the Village of Waverly into Plaintiff's other claims, it is well-established that plaintiffs who seek to impose liability on local governments under Section 1983 must do so through a *Monell* claim. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011).

14

dispute as to whether "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "Personal involvement may be shown by 'direct participation,' which requires in this context 'intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.'" *Id.* at 67 (quoting *Provost*, 262 F.3d at 155).

### 1. Defendant Leary

The record shows that Defendant Leary, as mayor of the Village of Waverly, contacted Mr. Khalil to inform him of the partial roof collapse. (Dkt. No. 50-15, ¶¶ 9–11). Mayor Leary, as one of the six members of the Village Board, voted in favor of the building's demolition. (*Id.*, ¶ 16). Following the Village Board's vote authorizing the demolition, Leary called a construction company to assist with the demolition. (*Id.*, ¶ 18). Based on Leary's role in the demolition process, a reasonable jury could find that he directly participated in the alleged constitutional violations. Therefore, Plaintiff's claims against him are not subject to dismissal on this basis.

### 2. Defendant Chisari

As to Defendant Chisari, the record shows that he was involved in periodic inspections of the NPL Building and had direct contact with Mr. Khalil on numerous occasions regarding maintenance of the NPL Building. (Dkt. No. 50-17, ¶ 5). Chisari and others were on the roof conducting a building inspection at the time of the partial collapse. (*Id.*, ¶¶ 10–12). Finally, prior to the Village Board's vote, Chisari provided the Board with a "fact-based oral report regarding what happened to [him] and two contractors on the roof [at the time of the collapse.]"

(*Id.*, ¶ 19).  Chisari did not make any recommendations or offer any opinions in opposition or support of demolition of the NPL Building.  (*Id.*, ¶ 20).

Plaintiff has failed to adduce any evidence that Defendant Chisari directly participated in the decision to declare an emergency and demolish Plaintiff's property, which is the core of Plaintiff's claims.[4]  Indeed, the Village Board's authorization of demolition was the root cause of Plaintiff's alleged constitutional injury, not Chisari's periodic inspections or presence at building at the time of the collapse.  Despite Plaintiff's erroneous claim that Defendant Chisari could have extended the date of demolition to provide time for repairs, the Village Code does not provide the Enforcement Officer with any such discretion in emergency situations.  (*Compare* Village Code § 54-5, *with* § 54-9; *see* Dkt. No 50-16, pp. 3–5).  At most, the record shows that Chisari was peripherally involved in the process leading up to the demolition.  Without more, no reasonable jury could conclude that Chisari was personally involved in the alleged constitutional violations.

Accordingly, Plaintiff's claims against Defendant Chisari must be dismissed.  *See e.g. Vision for Children, Inc. v. City of Kingston*, No. 1:15-CV-0164, 2017 WL 9249665, *13–14, 2017 U.S. Dist. LEXIS 222357, *39–43 (N.D.N.Y. June 7, 2017) (dismissing § 1983 claims against defendants where the plaintiff failed to adduce sufficient evidence to show sufficient direct participation in the decision to demolish the plaintiff's property); *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 443–44 (E.D.N.Y. May 3, 2012) (granting summary judgment where the defendant had no personal involvement in the constitutional violation and no power to remedy the alleged § 1983 violation even if the defendant was aware of the harm at the time).

---

[4] Nor has Plaintiff adduced sufficient evidence showing Chisari's personal involvement by any of the other methods recognized by the Second Circuit. *See Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (explaining that a plaintiff may establish personal involvement by making any one of five showings (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995))), *cert. denied, sub nom. Brooks v. Pataki*, 137 S. Ct. 380 (2016).

## B. DUE PROCESS CLAIMS

The Due Process Clause of the Fourteenth Amendment contains both a procedural component and a substantive component. *See Zinerman v. Burch*, 494 U.S. 113, 125 (1990); *see also Pabon v. Wright*, 459 F.3d 241, 250 (2d Cir. 2006). The procedural component requires that constitutionally adequate procedures must be provided before a person may be deprived of life, liberty, or property. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). By contrast, the substantive component "protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995).

### 1. Procedural Due Process Claim

Plaintiff's first claim asserts that the Village Defendants wrongly deprived Plaintiff of property without due process of law by failing to extend the date of demolition, and otherwise performing the demolition before Plaintiff had an opportunity to inspect the NPL Building. (Dkt. No. 17, ¶¶ 32–36).

A procedural due process violation under the Fourteenth Amendment occurs when the government deprives a person of a protected life, liberty, or property interest without first providing notice and opportunity to be heard. *See Spinelli v. City of New York*, 579 F.3d 160, 168 (2d Cir. 2009) (citing *Sanitation and Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 995 (2d Cir. 1997)). In evaluating a procedural due process claim, a district court must decide: "(1) whether [the plaintiff] possessed a liberty or property interest and, if so, (2) what process he was due before he could be deprived of that interest." *Sealed v. Sealed*, 332 F.3d 51, 55 (2d Cir. 2003) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002)).

However, "the necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Parratt v. Taylor,* 451 U.S. 527, 539 (1981). In other words, notice and pre-deprivation process need not be provided in emergency situations because property rights must give way to the greater need to protect public health and safety. *See Catanzaro v. Weiden,* 188 F.3d 56, 61–62 (2d Cir. 1999) (citing *Parratt*, 451 U.S. at 538–39).

When a state actor declares an emergency, courts avoid engaging in "hindsight analysis of whether an emergency actually existed, but rather, afford the decision to invite emergency some deference." *Catanzaro*, 188 F.3d at 62 (citing *Hodel*, 452 U.S. at 302–03). "Where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording pre-deprivation process would be otherwise impractical, the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion." *Id*. at 62–63. Ultimately, "[w]hether the official abused his discretion or acted arbitrarily in concluding that a genuine emergency exists is a factual issue, subject to the usual considerations for a district court addressing a summary judgment motion." *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 51 (2d Cir. 2009).

In this case, there is no dispute that Plaintiff possessed a protected property interest in its ownership of the NPL Building, and that Plaintiff did not receive pre-deprivation process before the demolition of its building. Rather, the parties dispute whether an emergency existed to justify immediate demolition. Therefore, the Court's inquiry is twofold: 1) whether there was an

emergency that required immediate action; and 2) whether adequate post-deprivation remedies were available. *Canzoneri v. Inc. Village of Rockville Ctr.*, 986 F. Supp. 2d 194, 203 (E.D.N.Y. 2013); *see also Reynolds v. Krebs*, 2008 WL 788603, at *4, 2008 U.S. Dist. LEXIS 22403, at *14 (W.D.N.Y. Mar. 20, 2008), *aff'd*, 336 Fed. App'x 27 (2d Cir. 2009).

### a. Emergency Situation

Defendants argue that Plaintiff's claim must fail "due to the emergency situation which arose following the partial roof collapse on April 6, 2015." (Dkt. No. 50-20, p. 10). The record shows that the partial collapse of the roof was the result of severe and persistent water damage caused by an inadequate roof, and that the Village provided Plaintiff with repeated warnings regarding the structure and maintenance of the NPL Building in the preceding years, which largely went unheeded. (Dkt. Nos. 50-14, 50-18). Indeed, after the Village designated the building as unsafe in October 2014, Plaintiff received repeated warnings in November and December that the roof was leaking and "causing structural damage," however, Plaintiff never objected to the Village's findings and never took any remedial action to address the Village's concerns. (Dkt No. 50-4, pp. 21:12–23:7, 34:10–35:5; 50-7, ¶ 26).

Critically, the record shows that after the partial roof collapse on April 6, 2015, when the Village Board invoked emergency procedures to demolish the building, they did so after receiving an opinion from Professional Engineer Kristi Rathbun, who had inspected the building shortly after the collapse. (Dkt. Nos. 50-15, ¶¶ 14–15; 50-17, ¶¶ 16–18). Ms. Rathbun found that the partial roof collapse of the NPL Building posed "an emergency situation because it was unstable and a threat to public safety as falling pieces of the building, or the entire building itself could have collapsed at any time and caused injury to people walking or driving below . . . ." (Dkt. No. 50-8, ¶ 15). Ms. Rathbun concluded that "the building at 439 Fulton Street needed to

be immediately condemned and demolished for the public's safety." (*Id.*). Although Plaintiff points out that Ms. Rathbun's report is dated April 8, 2016 (after the demolition took place), there is no dispute that she orally conveyed her opinion to the Defendants on April 6, 2015. (*See* Dkt. No. 50-8, ¶¶ 14-15; *see also* Dkt. Nos. 50-15, ¶¶ 14–15; 50-17, ¶ 17). Plaintiff's opposition papers do not challenge Ms. Rathbun's professional qualifications, the substance of her conclusions, or the process used to reach those conclusions.

Although Plaintiff claims that a true emergency did not exist, Plaintiff has not adduced any evidence to call into question the Village's decision. Mr. Khalil states in conclusory fashion that the building was "extremely strong," and "[e]ven with the partial roof collapse, it was very stable and this issue could have been remedied with immediate repair instead of immediate demolition." (Dkt. No. 53, ¶¶ 26–27). Putting aside Mr. Khalil's lack of qualifications as to structural engineering, it is undisputed that he did not view or inspect the building between the partial roof collapse and the demolition. (Dkt. No. 50-4, pp. 52:22–53:5). Rather, Ms. Rathbun was the only engineer to do so, and she found the circumstances sufficiently dire to recommend immediate demolition. The record shows that the Village Board then met in emergency session and unanimously decided that the building was a threat to public safety and needed to be demolished in accordance with Village Code § 54-9. (*See* Dkt. No. 50-15, ¶¶ 13–16).

To the extent Plaintiff argues that it was unlawfully denied the opportunity "to hire someone to conduct an additional inspection," (Dkt. No. 53-2, pp. 4–6), no such opportunity was required under the Village Code where the Village Board found an emergency threat to public safety which did not "permit any delay in correction." (Village Code § 54-9(A), (C); *see* Dkt. No 50-16, pp. 4–5). Plaintiff's suggestion that the Village should have followed a different provision of the Code, requiring advance notice before emergency work, merely second-guesses

the Board's decision as to the immediacy of the problem without any factual basis whatsoever.

In sum, the undisputed facts show that Defendants invoked emergency procedures to demolish Plaintiff's building only after the partial roof collapse and consulting with the engineer Ms. Rathbun, who recommended immediate demolition based on the dangerous structural integrity of the building and the threat to public safety. Her opinion provided competent evidence for the Defendants (and all the Village Board members) to reasonably believe that an emergency existed to justify immediate demolition. Plaintiff has failed to adduce any evidence whatsoever to raise an issue of fact as to the condition of the building at that time. Therefore, based on the undisputed facts, no reasonable jury could find that Defendants abused their discretion or acted arbitrarily by invoking emergency procedures to demolish the building.

Moreover, it is well-settled that an Article 78 proceeding is an adequate post-deprivation remedy for the emergency demolition of property. *See Reynolds v. Krebs*, 2008 WL 788603, at *4, 2008 U.S. Dist. LEXIS 22403, at *14 (W.D.N.Y. Mar. 20, 2008), *aff'd*, 336 Fed. App'x 27 (2d Cir. 2009); *see also Noroian v. City of Port Jervis*, 791 N.Y.S.2d 147, 148 (2d Dep't 2005) (holding that CPLR article 78 proceeding is sufficient post-deprivation process for immediate demolition of a dangerous building).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's procedural due process claim. *See generally Reynolds*, 336 Fed. App'x 27 (upholding summary judgment where it was reasonable for village officials to believe that an emergency situation existed and invoke emergency demolition procedures); *WWBITV, Inc.*, 589 F.3d 46 (affirming summary judgment where the plaintiffs failed to create a genuine dispute whether the defendants abused their discretion in determining that the threatened collapse of an old, fire-damaged hotel created a public emergency); *Catanzaro*, 18 F.3d 56 (affirming summary judgment where officials

21

reasonably believed that it was necessary to invoke emergency demolition to neutralize public safety risk created by a building damaged by a vehicle); *Kshel Realty Corp. v. City of New York*, 293 Fed. App'x 13 (affirming summary judgment where a municipal official's discretionary decision to invoke emergency procedures for the immediate demolition of a structure was reasonable given undisputed evidence of severe structural damage); *Smith v. City of Albany*, 250 Fed. App'x 417 (2d Cir. 2007) (upholding award of summary judgment where the plaintiff "failed to create an issue of fact as to the objective reasonableness of the municipal defendants' belief that [p]laintiff's building posed an imminent danger to the public, thus meriting emergency demolition.").

### 2.  Substantive Due Process Claim

To the extent Plaintiff asserts a substantive due process claim, it fails for the same reasons discussed above.  Again, Plaintiff has failed to raise an issue of fact as to the reasonableness of the Defendants' conduct.  "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'"  *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (1995) (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir. 1994)). Based on the undisputed facts, no jury could reasonably conclude that the Defendants' actions in furtherance of the demolition of the NPL Building were arbitrary or irrational.[5]

### C.  FOURTH AMENDMENT SEIZURE CLAIM

As to Plaintiff's claim that the demolition violated its Fourth Amendment right against unlawful seizure of property, Defendants argue that the seizure was reasonable and justified

---

[5]  Plaintiff's substantive due process claim is also subject to dismissal as it is redundant of the other explicit constitutional claims. *See DeBari v. Town of Middleton*, 9 F. Supp. 2d 156, 161 (N.D.N.Y. 1998) ("because plaintiffs' claim is grounded in an explicit textual source, their substantive due process claim must be dismissed").

under the circumstances, and therefore lawful under the Village Code. (Dkt. No. 50-20, pp. 10–13).

Whether the Fourth Amendment is violated depends upon whether the seizure at issue was "reasonable." *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 60–62 (1992). "Though the test of reasonableness is not capable of precise definition or mechanical application, it generally requires a careful balancing of government and private interests." *DeBari*, 9 F. Supp. 2d at 163 (quoting *Bell v. Wolfish*, 441 U.S. 520, 558 (1979)); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 66 (1993).

As explained above, the undisputed facts show that Defendants had a reasonable basis to invoke the Village's emergency procedures to seize and demolish Plaintiff's property, and Plaintiff has failed to raise an issue of fact otherwise. Accordingly, Plaintiff's Fourth Amendment claim must be dismissed for the same reasons. *See e.g. Smith v. City of Albany*, 03-cv-1157, 2006 U.S. Dist. LEXIS 22954, at *23–46, 2006 WL 839525, at *9–15 (N.D.N.Y. Mar. 27, 2006) (granting summary judgment on Fourth Amendment grounds where sufficient emergency threats to public safety necessitated immediate demolition of Plaintiff's building), *aff'd*, 250 Fed. App'x 417 (2d Cir. 2007).

### D. *MONELL* CLAIM AGAINST THE VILLAGE OF WAVERLY

As to Plaintiff's *Monell* claim, Defendants argue that Plaintiff "cannot establish a Monell claim based on a policy, custom and/or practice instituted by the Village of Waverly." (Dkt. No. 50-20, p. 15). "For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694), but a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. "To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

Here, Plaintiff alleges that "not only did the Defendant [sic] deprive the Plaintiff of federally protected rights, but the Village policy caused the deprivation of the Plaintiff's constitutional rights pursuant to its municipal custom, practice and policy." (Dkt. No. 17, ¶ 36).[6] Plaintiff further suggests that it was "not given due process, and the lack of criteria required for statute 54-9(C), while perhaps not blatantly unconstitutional on its face, has led to a constitutional violation in this case and could again in the future." (Dkt. No. 53-2, p. 8).

Plaintiff's *Monell* claim falls flat because Plaintiff has adduced no evidence to permit a rational finding that it was deprived of any constitutional right, as discussed above, much less that a Village policy or custom caused that deprivation. Accordingly, Defendants are entitled to summary judgment on Plaintiff's *Monell* claim.[7] *See Monell*, 446 U.S. at 694–695; *see also Askins v. John Doe #1*, 727 F.3d 248, 253 (2d Cir. 2013) ("[A] municipality cannot be liable under *Monell* where plaintiff cannot establish a violation of his constitutional rights. Unless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose

---

[6] The Court notes that Plaintiff withdrew its *Monell* claims against Mayor Leary and Code Enforcement Official Chisari in Plaintiff's opposition papers to Defendants' motion. (Dkt. No. 53-2, p. 9 ("[Plaintiff] withdraws its Monell Claims against Daniel Leary and Robert Chisari.")).

[7] Plaintiff's opposition papers assert that the actions of the Waverly Village Board subject the village to *Monell* liability, (Dkt. No. 53-2, pp. 6–8), a theory of liability not expressly alleged in the Amendment Complaint, as the Defendants point out. (Dkt. No. 54, pp. 8–9). Regardless, any *Monell* claim premised on the decision to demolish Plaintiff's building must fail because there is no evidence to permit a rational finding that the decision was unreasonable or violated Plaintiff's constitutional rights, as discussed above.

conduct the municipality can be responsible, there is no basis for holding the municipality liable. *Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy."); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (municipal liability under *Monell* may only lie where there is an underlying constitutional violation).

### E.  QUALIFIED IMMUNITY

Finally, Defendants Leary and Chisari contend that even if they somehow violated Plaintiff's constitutional rights, they are nonetheless entitled to qualified immunity.  (Dkt. No. 50-20, pp. 19–20).  Having found insufficient personal involvement as to Chisari, and that Plaintiff cannot sustain a claim against Leary based on a constitutional violation, the Court need not address qualified immunity.  Even so, based on the undisputed facts, the Court agrees with Defendants that qualified immunity would apply.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  Yet, even if the rights in question are clearly established, a government actor may still be shielded by qualified immunity if "it was objectively reasonable for the public official to believe that his acts did not violate those rights."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (holding that an official is entitled to qualified immunity so long as his "actions could reasonably have been thought consistent with the rights . . . violated."); *see also Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991); *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990); *Doe v. Marsh*, 105 F.3d 106, 109 (2d Cir. 1997).

Given the undisputed facts and analysis set out above, the Court concludes that it was objectively reasonable for Defendants to treat the partial collapse of the NPL Building as a serious public health and safety hazard. Defendants submitted evidence that they relied on the professional engineering opinion of Ms. Rathbun, who inspected the building after its partial roof collapse and recommended immediate demolition. (Dkt. Nos. 50-8, ¶¶ 4–15; 50-15, ¶¶ 15–16; 50-17, ¶¶ 16–18). Even if Ms. Rathbun was somehow incorrect, as Plaintiff suggests, there is no evidence showing that Defendants had any reason to doubt her professional opinion. Nor is there is any evidence that Defendants departed from the Village's procedures for emergency demolition.

Therefore, viewing the facts in the light most favorable to Plaintiff, Defendants would be entitled to qualified immunity because it was objectively reasonable for them to believe that their actions contributing to the demolition of Plaintiff's building were lawful.[8] *See Williams v. Greifinger*, 97 F.3d 699, 707 (2d Cir. 1996); *see also Waldron v. Rotzler*, 862 F. Supp. 763, 772 (N.D.N.Y. 1994) (undisputed facts concerning defendant's observations and conduct compelled finding of objective reasonableness, therefore city officials entitled to qualified immunity after demolition of plaintiff's building without notice and opportunity to be heard).

---

[8] Given the forgoing analysis, the Court need not address the merits of Defendants' claim that Plaintiff's responses to certain contention interrogatories are dispositive of this action through Plaintiff's alleged constructive withdrawal of all claims. (*See* Dkt. No. 50-20, pp. 7–10). Nonetheless, the Court reminds the parties of their duty to respond or object to interrogatories from opposing counsel, as well as their obligation to attempt to resolve discovery disputes before raising them before the Court. Fed. R. Civ. P. 33(b)(1), (4); 37(a)(1). When necessary, the parties should first seek clarity from opposing counsel regarding discovery and interrogatory responses where questions of accuracy and/or completeness arise, especially where those questions present issues that could potentially have a dispositive effect on a party's claims. *See* N.D.N.Y. Local Rule 7.1(d)(1).

**V. CONCLUSION**

For the reasons identified herein, it is

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 50), is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 17) is **DISMISSED with prejudice**; and finally, it is

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

December 28, 2018
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge